**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DANIELLE M. SUTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-00457-NKL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Danielle M. Suter appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. The decision is affirmed.

## I.       Background

Suter was born in 1978 and alleges a disability onset date of 10/10/2011. Her date last insured was 6/30/2015. The Administrative Law Judge denied her application on 3/8/2013 and the Appeals Council denied her request for review on 1/4/2016.[1] In this appeal, Suter challenges the weight the ALJ gave certain opinion evidence, and the ALJ's assessment of the effect of her obesity and of her credibility. Suter also challenges the ALJ's findings at Step 5 of the sequential analysis.

---

[1]       This is Suter's second appeal of the denial of benefits. In her first appeal, this Court granted the Commissioner's unopposed motion to reverse and remand for further proceedings. *See Suter v. Colvin,* case no. 04:14-cv-00383-NKL (Order dated 11/19/2014). As directed on remand by the Appeals Council, the ALJ treated Suter's psychologist, Nina Epperson, M.S., as an acceptable medical source, and included limitations in the RFC related to a severe impairment, asthma.

## A.     Medical history

In October 2011, Suter complained to her primary care provider of fatigue and all-over body pain.  Labs were negative for autoimmune diseases but reflected high C-reactive protein levels.  She was prescribed asthma medication.  At a November 2011 visit, she complained of low back pain and muscle aches and said she was concerned that she had lupus.  Her doctor assessed myalgia and referred her for rheumatology and neurology consults.  At a December 2011 visit, she complained of trouble walking and shortness of breath.  Labs reflected high C-reactive protein levels.  An echocardiogram was normal.  Tr. 317-18.  Suter's C-reactive protein was high in January 2012.

Suter saw Shannon Kohake, M.D., a neurologist later February 2012.  Suter complained of weakness, muscle spasms and pain, and poor concentration and memory loss.  Under Plan, Dr. Kohake noted, "Overall, the patient's exam was unremarkable except for some pain limitation in muscle strength testing of the right hip flexor related to obvious pain in the region." Tr. 297.  The doctor recommended MRIs of the brain given Suter's complaints of memory difficulties and word-finding, and of the cervical and lumbar spine, due to complaints of muscle weakness, spasms, and gait disturbance.  The doctor also recommended a nerve conduction study and some labs.

Suter had the nerve conduction study (of all limbs) the day after she saw Dr. Kohake. Steven Koss, M.D., a neurologist, concluded that the findings were all normal except for "mild" findings at the right wrist consistent with the clinical diagnosis of carpal tunnel syndrome. "There [was] no evidence of other mononeuropathies, large fiber peripheral neuropathy, lumbosacral/cervical neuropathy, or myopathy."  Tr. 292.  The MRIs of Suter's brain, cervical spine and lumbar spine were normal, except for a finding of some degenerative changes in the

apophyseal joints at L4-L5 and L5-S1.

In March 2012, Suter had her first visit with a rheumatologist, Arnold Katz, M.D. She told the doctor that she had had pain in her hips, legs, chest, and heart area since October 2011, was nauseated and spent a lot of time in bed. She was concerned that she might have lupus or multiple sclerosis. Dr. Katz noted that Suter had had negative autoimmune testing, and an MRI of her brain and extensive neurological work up were normal, and that her neurologist did not feel her symptoms were related to a neurological disorder. Dr. Katz also noted Suter's diagnosis of fibromyalgia, Suter's complaint that she sometimes could not move her right leg because it felt "paralyzed" and her normal lumbar MRI. Tr. 304. After examining Suter, Dr. Katz's assessment was active fibromyalgia, fatigue, persistent nausea, obesity, hematuria, asthma, insulin-dependent diabetes, rosacea, and depression. The doctor explained to Suter that she had classic signs and symptoms of fibromyalgia. Based on her negative autoimmune bloodwork and in the "absence of hard features suggesting lupus," he did not believe she had lupus or "any other classic connective tissue disease." Tr. 308. He also noted that "[t]here are multiple reasons for an elevated C-reactive protein [level], and [Suter's] elevations [were] not particularly high," so he did not feel they were "representative of any underlying connective tissue disease." *Id.* He ordered lab tests and a chest x-ray, and started a trial of gabapentin for pain.

Suter saw Melissa Rosso, M.D., a primary care provider, in May 2012, reporting "a myriad physical complaints." Tr. 358. On exam, Dr. Rosso noted memory recall of two out of three words, decreased temperature sensation in Suter's previously injured ankle, proximal weakness greater than distal weakness in the limbs, and some reduction in flexion and extension of the joints bilaterally. The doctor also noted a rash on Suter's face in a butterfly-shaped distribution. Tr. 359. Dr. Rosso's Assessment was chronic pain. She noted that Suter's

symptoms were not entirely consistent with fibromyalgia and that she suspected an autoimmune disorder. Under Plan, Dr. Rosso noted that Suter should continue gabapentin and NSAIDs, and would be referred to KU to establish care in the Family Medicine Clinic, and then obtain a rheumatology consult at KU.

In July 2012, Suter saw Elizabeth Gerstner, M.D., a primary care physician, to reestablish care. Dr. Gerstner noted no abnormalities on physical exam. Suter was interested in medical marijuana for her fibromyalgia. The doctor declined to prescribe it because it was not a typical treatment, and recommended that Suter continue her current medication. The doctor noted that Suter had failed trials of antidepressants in the past and recommended that Suter consider a psychiatric consult.

Suter had a follow-up appointment on 7/25/2012 with Dr. Kohake, the neurologist, for muscle pain and myalgias. The doctor noted that Suter's MRI results were largely normal and her rheumatology work up was negative. Suter said her concentration was a bit worse and that she had difficulty with sleep, which she related to Dr. Katz's prescription of gabapentin for pain. Physical exam was normal except that the doctor could not obtain reflexes in the lower extremities and there was some give-way weakness. Also, Suter gave poor effort on the motor exam. Dr. Kohake's Assessment was subjective muscle weakness, myalgias, muscle spasms, gait disturbance, and memory difficulty. Under Plan, Dr. Kohake noted that the etiology of Suter's symptoms was unclear, "however, we have not found a neurologic cause." Tr. 364. The doctor discussed neuropsychological testing for Suter's memory complaints and suggested that she check with her insurance. The doctor also discussed different medication options for Suter's pain, but Suter was reluctant to try new ones because of past adverse effects on her mood. Finally, Dr. Kohake recommended therapy for treatment of Suter's depression.

In September 2012, Suter saw a rheumatologist, Celso Raul Velazquez, M.D., on referral from Dr. Spurlock. Suter told him that she had severe pain and achiness in her thighs and calves when she walked, and she could not use stairs; had severe, daily low back pain; and had tingling and weakness in her hands and feet, and weakness in her shoulders. The doctor noted on physical exam that Suter had decreased strength, but her "effort [was] inconsistent" and she had multiple fibromyalgia tender points. Tr. 383. Her joints were cool with normal range of motion and no swelling. Dr. Velazquez's Assessment included myalgias, polyarthralgias, "multiple symptoms that I cannot explain," and "[s]ome … symptoms suggest[ing] fibromyalgia[.]" *Id.* He further noted, "I do not think she has lupus or another autoimmune rheumatic disease because she has no skin, joint, kidney or hematological abnormality to support this diagnosis." *Id.* He recommended "a second opinion from another neurologist." *Id.*

In October 2012, Suter saw a gastroenterologist, Gregory Barber, M.D. with complaints of bloating and diarrhea. The doctor's Impression was gastroesophageal reflux disease, abdominal bloating, and diarrhea. He prescribed Levbid and Zantac. A gastric emptying study was normal.

Suter had a hysterectomy in December 2012.

On 3/6/2013, Suter saw Yvonne Spurlock, D.O., a primary care physician. Suter said she thought she had lupus and wanted Dr. Spurlock to diagnose her with and treat her for it. Dr. Spurlock said she would order labs, but was not comfortable making the diagnosis. The doctor also explained that the treatment had serious side effects. She recommended that Suter pursue a support group or another opinion from another specialist.

Suter saw Dr. Spurlock again on 3/20/2013. Suter complained of a lot of all-over pain, and said she was very depressed and had been "suicidal a couple of days ago," but was not

currently. Tr. 986. She said she had not seen a psychiatrist in some time but needed to, to document that she had tried multiple antidepressants since childhood and that they did not work. Dr. Spurlock said she would arrange for a psychiatric evaluation and provided Suter with records.

On 3/27/2013, Suter was seen at the MU Center for Rheumatology by C. Siva, M.D., for a "4th opinion on fibromyalgia vs lupus diagnosis." Tr. 889. Her chief complaint was "extreme pain everywhere[.]" *Id.* Dr. Siva reviewed Suter's medical records and test results. He noted facial flushing and diffuse allodynia and myofascial tenderness on physical exam. Under Assessment and Plan, he stated that he had reassured Suter there was "no objective evidence for" rheumatoid arthritis or lupus, and that the non-specific anti-inflammatory markers could be due to other medical conditions such as obesity and diabetes. Tr. 891. He suggested she try increasing her clonazepam dosage for pain, but she said it would be too sedating and asked about Vicodin. Dr. Siva suggested she talk to her primary care provider about Vicodin. He noted that she had a pending appointment with a psychiatrist and suggested she try different medications while under his supervision. He also gave her materials about self-management of chronic, widespread pain. *Id.*

In July 2013, Suter saw Dr. Spurlock with complaints of pain. The only finding on physical exam was mild swelling in the legs. Dr. Spurlock's Assessment was chronic pain, chronic diarrhea, chronic nausea, uncontrolled diabetes mellitus, fibromyalgia, and depression and anxiety. Under Plan, the doctor noted that Suter would continue to see her psychologist. The doctor also recommended "possibl[e] shock therapy." Tr. 969. Suter said that her psychologist said it was "not appropriate for" her. *Id.* Suter did not want to try any medications such as Neurontin or antidepressants due to past reactions. Dr. Spurlock ordered labs.

Suter returned to Dr. Barber, the gastroenterologist, in August 2013. The doctor suspected inflammatory bowel disease. The results of an esophagogastroduodenoscopy and a colonoscopy were normal.

In September 2013, Suter returned to Dr. Katz, the rheumatologist, with complaints of pain and low-grade fever. He noted no edema in the extremities and that Suter's "last [complete blood count] was fine." Tr. 950. Her temperature was normal. Dr. Katz's Assessment was fibromyalgia, resistant to usual treatments; unexplained low grade fever; insomnia; fatigue; and depression. Under Plan, he noted that he would obtain an infectious disease consultation and pain management evaluation, and prescribed Dolobid for pain.

Later the same month, Suter saw Dan Hancock, M.D. at the Centerpoint Medical Center pain clinic. Under History, Dr. Hancock noted that Suter:

> [P]resents with a complex and convoluted past medical history. She presents with the dreaded complaint of "constant pain all over my body." She states that since she was diagnosed with fibromyalgia in 2003, she has had "head to toe pain which feels as though I am being crushed all over my body."

Tr. 931. Findings on physical exam were all normal, except that Suter identified tenderness at 18 of the 18 tender points designated by the American Rheumatological Association, including multiple soft tissue locations. The doctor noted that in filling out the intake questionnaire, Suter had marked 16 of the 17 pain descriptors. He noted that individuals who select more than 7 descriptors are those "who tend to over-magnify and are prone to somatoform disorders." Tr. 933. Dr. Hancock further wrote:

> Note should also be made that although this patient does express a certain degree of frustration about the inability of medical personnel to identify the cause of her painful symptoms, the more she discusses her underlying symptoms, the more she appears to obtain some sense of enjoyment or pleasure that she has been able

> to "stump" as many physicians as she has, because she states that none of the doctors that she has seen have been able to provide her with any answers as to why she has experienced these painful symptoms.

*Id.* Dr. Hancock's Impressions included "chronic pain syndrome, etiology undetermined," morbid obesity, "fibromyalgia-type symptoms," clinical depression, obsessive/compulsive disorder, right carpal tunnel syndrome, and GERD. *Id.* Under Plan, the doctor stated that he had had a long discussion with Suter and her mother, and informed them that he had "nothing to offer…for the treatment of" Suter's "chronic pain syndrome." *Id.* He told them that Suter's complaint of pain "over every square inch of her body" was not amenable to any type of interventional therapy. *Id.* He considered that she had tried "the gamut" of multiple antidepressants, anti-inflammatory, and anti-neuropathic pain medications and that she had stated she was intolerant of all of them. He did not recommend opioids. He did recommend cognitive behavioral therapy, which in his opinion "offered the greatest likelihood of success in treating [her] underlying condition." Tr. 934.

Suter saw Daniel Geha, M.D., in October 2013 for an infectious disease consultation, and with complaints of a 10-day, low-grade fever and pain. Her temperature was 98.8° F. Dr. Geha's Assessment was unspecified myalgia and myositis; malaise and fatigue; fever, unspecified; and insomnia, unspecified. Tr. 1011. He also noted chronic fatigue with fibromyalgia, "[n]o other etiology established at this time[,]" and recommended "continued symptomatic treatment with regular medical follow up." *Id.*

At a follow up in January 2014 with Dr. Katz, the rheumatologist, Suter reported that the pain management doctor, Dr. Hancock, "did not believe in fibromyalgia," and that the infectious disease specialist, Dr. Geha, "felt that her fever was 'fibromyalgia-related.'" Tr. 952. Dr. Katz

noted that Suter had 16 out of 18 classic fibromyalgia tender points on exam and an erythematous blush on both cheeks. His assessment was fibromyalgia, active; insomnia; chronic fatigue; chronic headaches; right plantar fasciitis; and IBS. He increased her clonazepam dosage, discontinued diclofenac and started ketoprofen. He also ordered an x-ray of her foot.

Suter saw Casey Williams, M.D. in March 2014 for left shoulder pain. She had decreased range of motion and crepitus. The doctor ordered an MRI and physical therapy. The MRI showed mild acromioclavicular, degenerative changes.

At an April 2014 follow up with Dr. Katz, Suter complained of low energy and that she could not sit or stand for prolonged periods. She had tenderness in both shoulders and 18 out of 18 fibromyalgia tender points. The doctor prescribed lorazepam and Robaxin. Tr. 956.

In June 2014, Suter saw Dr. Spurlock with complaints of insomnia. The doctor prescribed a trial of Lunesta.

At a July 2014 visit with Dr. Katz, Suter had 15 out of 18 fibromyalgia tender points. The doctor noted "no acute joints." Tr. 1108. He increased Suter's Trazodone for sleep and continued Robaxin, and told her to come back in three months.

In October 2014, Dr. Katz increased Suter's Trazodone dosage. At a January 2015 visit with Dr. Katz, Suter was sitting in a wheelchair. She complained of fevers. Her temperature was 97.16° F. Dr. Katz noted that she seemed to be weak getting up from the chair, and reported 18 of 18 fibromyalgia tender points. She had fine resting tremors in both hands. The doctor stopped the Robaxin and started a trial of Tizanidine as needed, and continued her other medications.

In April 2015, Suter reported sleeping well on Trazadone but hurting badly. She had 16 out of 18 tender points and a resting tremor. The Tizanidine was increased.

In May 2015, Suter was seen by Gregory Ballard, M.D. for right knee pain. Injections were tried, but did not help. Her gait was antalgic and she reported that she had pain with prolonged standing, walking, and climbing stairs. Later the same month, Suter had arthroscopic surgery on the knee to repair a meniscal tear.

## B.    Psychological and psychiatric treatment

In June 2014, Suter went through the intake process for receiving mental health treatment through Tri-County Mental Health Services. She began seeing Sue Southworth, Psy.D., for counseling later the same month.

In July 2014, Suter had a psychiatric evaluation by Partmal Purohit, M.D. at Southworth's request. Suter told the doctor that she was not interested in any medication. She said her primary care physician had been working with her regarding her fibromyalgia and "suspected lupus." Tr. 1161. She reported that "for [the] last several months" she had had an "increasing tired feeling, low motivation, less sleep, low energy and interest and having increasing fibromyalgia symptoms." *Id.* Under Mental Status Exam, Dr. Purohit noted that Suter was:

> [A]rgumentative and resistive and trying to prove point that anti-depression medication is not necessary, mood irritable with appropriate affect, denies any suicidal or homicidal ideations or any overt psychotic symptoms. Patient is alert, oriented x3, short-term one out of 3 things after 5 minutes and remote memory appears sketchy but some appears to be deliberate, concentration fair to poor, approximate answer on serial 7, average intelligence, abstract thinking intact, fair to poor insight and judgment.

Tr. 1162. Dr. Purohit diagnosed PTSD; rule-out bipolar mood disorder type II mixed; intermittent explosive disorder; and borderline personality disorder. Under Plan, the doctor's recommendations included individual therapy and weekly journaling to monitor the progress of

treatment. He discussed also mood stabilizing medications with Suter, including lithium, Depakote ER, Tegretol, Trileptal, and Topamax, as well as "atypicals" such as Geodon, Seroquel XR, Abilify, and Latuda. *Id.* She did not want take any medications at that time and said she would like to review effects and side effects profile, and discuss them with him at a follow up visit.

In total, Suter saw Southworth for a total of 19 visits, through June 2015. She reported that her sessions were "very helpful" (7/9/2014). She "believe[d] that her anxiety and depression are related to past trauma" and was "pleased with her progress on parenting" (9/22/2014). She "[felt] much less anxious" (10/8/2014). She was "feeling less anxiety and depression" (10/22/2014). She was "sad and anxious about" her son graduating and moving away (12/18/2014). She "was feeling more confident and having a successful relationship with her boyfriend" and was "using her coping skills well" (3/3/215). She was experiencing "some anxiety about her upcoming wedding" (3/26/2015). She was feeling a "high level of stress due to her wedding coming up" and having communication problems with her mother (4/8/2015). She was experiencing "a lot of stress due to [her] relatives and wedding" (4/22/2015). She got married and the wedding "was a high stress situation, but the tools she learned in therapy were helpful" and she was "very proud of herself" (5/20/2015). She was "distraught and anxious" after she and her husband were kicked out of his mother's house where they had been living (6/17/2015). Tr. 11554-59.

**C.    Expert opinions**

Deborah Doxsee, Psy.D., non-examining, non-treating State agency psychologist, prepared a Psychiatric Review Technique Form on 1/18/12. Dr. Doxsee opined that Suter did not have a medically determinable mental impairment. Tr. 273. The ALJ gave Dr. Doxsee's

opinion "little" weight because the record as a whole establishes that Suter has mental impairments.  Tr. 450.

Teresa Short, RNBC, FNP, filled out a Physician's Residual Functional Capacity Form 9 on 9/25/12.  Tr. 348-351.  She opined that Suter could lift or carry less than 10 pounds; sit, stand, or walk less than 1 hour at a time; would need to lie down and elevate her feet for more than 4 hours; cannot use her hands repetitively for grasping, fine manipulation; and cannot perform jobs requiring bilateral manual dexterity; should never squat, crawl, kneel, climb, or reach; can occasionally bend, stoop, crouch, and maintain balance; cannot be around unprotected heights or moving machinery; and cannot be exposed to marked changes in temperature and humidity, or dust and fumes.  Short noted that she believed Suter's pain reports, based on her flat affect and pain with movement.  Short opined that Suter's pain was debilitating and fatigue was frequently debilitating. Short opined that Suter has sensory problems including double vision, eye focusing problems, dizziness, problems hearing, lethargy, difficulty speaking, poor coordination, lack of alertness, and numbness and decreased sensation in the extremities.  Short opined that Suter has mental problems of depression, irritability, social isolation, short attention span, and memory problems, was unable to focus and concentrate, and her medication had side effects of agitation, paranoia, mood swings, and rages.  Short opined that Suter had poor or no ability to deal with even a low stress job.  She anticipated that Suter's impairments or treatment would cause her to miss work three or more times per month.  Where asked on the form to identify supporting clinical and lab findings, Short stated only, "will defer to the rheumatologist[.]"  Tr. 351.  The ALJ gave Short's opinion "little" weight because it imposed extreme functional limitations without discussion of clinical findings, Short merely deferred to a rheumatologist for possible findings, and Short was not an acceptable medical source.  Tr. 449.

Nina Epperson, M.S., licensed psychologist, performed a consultative exam on 9/21/12. Tr. 385-388. Suter's chief complaints were depression and anxiety. She reported that she had never had psychiatric inpatient treatment, and had tried antidepressants and other psychotropics but could not tolerate them. She said her legs did not work because of her fibromyalgia and that she had problems with short term memory. She endorsed symptoms of anhedonia and avolition. Epperson noted depressed mood; bland affect; decreased motor functioning; thought content focused on helplessness, hopelessness, worthlessness; and that Suter "appeared dramatic" and was "very somatic." Tr. 386. Testing showed no problems with immediate or long term memory, attention or concentration, judgment, or abstract reasoning ability. Epperson's Diagnoses were major depressive disorder, recurrent-moderate, rule out somatization disorder; personality disorder, not otherwise specified; and GAF of 52. Epperson opined that Suter has a mental illness which precludes her from engaging in employment suitable for her age, training, experience, or education for a period of 6-12 months. Tr. 388.

Epperson reevaluated Suter on 4/11/14. Tr. 959-962. Suter's chief complaints were depression and anxiety. She said she worried "excessively about various life events" and had "significant distress due to her health conditions." Tr. 959. She told Epperson that she was prescribed "Lantus, Benadryl, Nexium, Novalog, Singulair, Tylenol, Vitamin D3 and Zyrtec," and said she could not tolerate any type of SSRI or Neurontin because they "cause her to experience paranoia and rage." Tr. 959. Epperson noted that Suter had good hygiene and grooming and her nails were nicely painted; had depressed mood; had appropriate affect; had intact judgment and insight; was fully oriented; had poor attention and concentration; was focused on somatic themes; and had organized and goal-directed flow of thought. Suter showed no problems with immediate memory, but did with recent and long-term memory. Epperson's

Diagnoses were major depressive disorder, recurrent-moderate; rule out somatization disorder; rule out post-traumatic stress disorder; borderline personality traits; and GAF 51. Epperson opined that Suter has a mental illness which prevents her from being suitably employed and would last 13 months or longer. The ALJ did not give Epperson's opinions any weight, noting that they were not supported by her own exam findings or the medical evidence on the whole record, and that they went to the ultimate issue of disability. Tr. 449.

Samuel Landau, M.D., a non-examining expert, testified at the hearing in Suter's original appeal. Tr. 53-55. He opined Suter could stand or walk for 2 hours but only 15-30 minutes at a time; should avoid uneven surfaces; should be given the option of elevating her feet six inches above floor level as needed, and standing and stretching every hour for 1-3 minutes. Lifting and carrying were limited to 20 pounds occasionally and 10 pounds frequently. He opined that she can occasionally stoop, bend, and climb stairs; could not squat, kneel, crawl, run, or jump, climb ladders, work at heights, or balance; on the right, she is limited to no forceful gripping, grasping, or twisting but can do frequent fine manipulation such as keyboarding and frequent gross manipulation such as opening drawers and carrying files. He further opined that her nausea, dyspepsia, and heartburn are consistent with IBS and fibromyalgia. The ALJ gave Dr. Landau's opinions "partial" weight, because the record as a whole supports greater lifting limitations, and no manipulative limitation. Tr. 450.

Marc Maddox, Psy. D., a non-examining, non-treating State agency psychologist, prepared a Psychiatric Review Technique Form on 7/29/14. Tr. 521-533. He opined that Suter had moderate limitations in understanding and remembering detailed instructions, but was not significantly limited in understanding and remembering simple instructions, or locations and work procedures. He opined that Suter could carry out very short and simple instructions,

perform activities on a schedule, sustain an ordinary routine without special supervision, work around others without distraction, interact adequately with peers and supervisors, and make simple work-related decisions, but was moderately limited in the ability to carry out detailed instructions, or maintain concentration for extended periods. She had moderate limitations in social interactions. She could adapt to most common challenges in the workplace. Dr. Maddox extensively cited the medical records, noting negative exam findings, sporadic mental health treatment, evidence of symptom magnification, and no psychiatric hospitalizations. The ALJ did not explicitly refer to Dr. Maddox's opinion.

### D. Suter's function report and the hearing testimony

In her adult function report dated June 2014, Suter stated that she had extreme fibromyalgia. She reported daily, extreme pain, weakness, and swelling in her extremities, and said that on the pain scale of 1 to 10, child birth had been a level 4, compared to the average level 8-10 pain that she experiences every day. She said she has had memory problems since 2008 after she had a concussion and they have worsened since then, and she cannot remember "simple instructions or questions at all." Tr. 754. She is "never completely strong enough emotionally or physically to do 'fun' things." *Id.* She "forget[s] how to say words, spell and sometimes even how to speak." Tr. 756. She also reported insomnia "that appears to be untreatable." Tr. 747. She stated that her rheumatologist had prescribed Trazodone for insomnia but she had had a severe reaction to it and was told she would not go back on it again.

At the hearing of July 2015, Suter testified that she did customer service and call-center work from 2007 until 2011, going from full-time to part-time, and then quitting because of swelling and pain, and memory problems. Currently, she said, she spends most of her time in bed due to swelling and pain. She can't hold things like a book because of hand pain. Because

of hand tremors, she doesn't use forks or knives, and her "food gets flung around a lot." Tr. 484. She testified that a side effect of her prescriptions is extreme drowsiness: "They knock me out for many hours. Like, anywhere from 12 to 16 hours." Tr. 485. She testified that she cannot tolerate anti-depressants. She reported having "flares" of symptoms of joint pain and IBS lasting "anywhere from a week to a couple of months." Tr. 486.

### E.    The ALJ's decision

The ALJ found that during the relevant period, Suter had severe impairments of obesity; diabetes mellitus; asthma; fibromyalgia, also diagnosed as chronic pain of unknown etiology; chronic fatigue; history of total hysterectomy for treatment of endometriosis; degenerative disc disease of the lumbar spine; chondromalacia in the right knee; headaches; depressive disorder; anxiety disorder; post-traumatic stress disorder; personality disorder; and rule-out diagnoses of somatization disorder and bipolar disorder. Tr. 441. Suter did not claim to meet any Listings, and the ALJ did not find that she met any.

The ALJ found Suter has the residual functional capacity to:

> [L]ift and carry about 5 pounds frequently and 10 pounds occasionally. In an 8-hour workday with normal breaks, she can sit about 6 hours and stand and/or walk about 2 hours. She requires the ability to change positions briefly (one minute or less) every 30 minutes. She should never climb ladders, ropes or scaffolds and never work at unprotected heights or around dangerous machinery. She should not work around high concentrations of dust, fumes, gases or similar pulmonary irritants. She should never be required to kneel, crouch, crawl or walk on uneven surfaces. She is limited to occasional climbing of ramps or stairs, and to occasional bending and stooping. She is limited to unskilled work involving only simple, repetitive tasks that do not involve fast-paced activity or high production quotas. She is limited to occasional interaction with the public and co-workers.

*Id.* The ALJ concluded that Suter was capable of performing the requirements of representative

occupations such as document preparer, addressing clerk, and cutter/paster which are sedentary jobs existing in significant numbers in the national economy. The ALJ concluded that Suter was not disabled and benefits were denied.

## II. Discussion

Suter argues that reversal is necessary because the ALJ did not properly weigh the opinion evidence, account for her obesity, or assess her credibility. She further argues that the Commissioner failed to sustain her burden at Step 5 of the sequential analysis.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id.* The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A. The opinion evidence

Suter argues that the ALJ did not properly weigh the opinions of Dr. Landau, Teresa Short, Dr. Maddox, and Nina Epperson.

The ALJ evaluated the opinion evidence under 20 C.F.R. §§ 404.1527 and 416.927. The regulations provide that, in weighing medical opinion evidence, the Commissioner considers

whether there is an examining or treatment relationship; the length of the treatment relationship and frequency of examinations; the nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors such as familiarity with the disability programs and their evidentiary requirements. §§ 404.1527(c)(1)-(6) and 416.927(c)(1)-(6). But an opinion that a claimant is disabled or unable to work, or about a claimant's residual functional capacity is not treated as a medical opinion because such issues are reserved to the Commissioner. §§ 404.1527(d) and 416.927(d).

### 1. Dr. Landau

Suter argues that the ALJ merely picked and chose from Dr. Landau's opinion. Dr. Landau opined about Suter's physical limitations, but the ALJ gave the opinion only "partial" weight on the basis that the record as a whole supported greater lifting limitations than those Dr. Landau identified and did not support the manipulative limitations he identified. Suter also complains that in formulating the RFC, the ALJ did not incorporate other limitations that Dr. Landau identified—standing or walking for a total of two hours, but only 15-30 minutes at a time; the option of elevating Suter's feet six inches above the floor; standing and stretching every hour for one to three minutes; and no running, jumping, squatting, or balancing. But the ALJ is not required to wholly adopt or reject any opinion. *Myers v. Colvin,* 721 F.3d 521, 527 (8th Cir. 2013); and *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011).

Furthermore, Dr. Suter never treated or examined Suter. Nor do Suter's medical records document manipulative difficulties, whether in exam notes or test results, nor even that Suter has complained to her treatment providers about such issues. Similarly, the record does not reflect that any treatment provider ever instructed Suter to limit her activities, or endorsed the standing, walking, and other movement limitations that Dr. Landau identified. The record also reflects

that after Dr. Landau offered his opinion, Suter had surgery to address knee pain caused by a meniscal tear. Substantial evidence on the whole record supports the ALJ's decision to give Dr. Landau's opinion only partial weight.

Moreover, an ALJ is not required to provide a line-by-line discussion of how inconsistencies or ambiguities in the record are resolved. *See McVoy v. Astrue,* 648 F.3d 605, 615 (8th Cir. 2011).

### 2.    Nurse Short

Nurse Short opined that Suter had extreme functional limitations. Contrary to §§ 404.1527(c)(3) and 416.927(c)(3), Short did not provide support for her opinion. She did not identify any medical conditions and the effects they had on Suter's functional limitations, nor any clinical or laboratory findings to support her opinion. She simply "defer[red] to rheumatology." Tr. 351. Further, the record does not reflect that any treatment provider ever instructed Suter to limit her activities or endorsed the extreme limitations that Short identified, and Short's opinions are even inconsistent with her treatment notes. The same day that Short filled out the form, she examined Suter, noting largely normal findings, such as normal gait, without focal weakness or deformity; normal sensation; full range of motion of the head and neck, without tenderness or abnormal movements; and that Suter was alert and oriented with no impairment of recent or remote memory. Tr. 391. §§ 404.1527(c)(4) and 416.927(c)(4); *Lawson v. Colvin,* 807 F.3d 962, 967 (8th Cir. 2015) (in weighing "other source" opinion evidence, an ALJ has the discretion to consider any inconsistencies found in the record).

Substantial evidence on the whole record supports the ALJ's decision to give Nurse Short's opinion little weight.

### 3. Dr. Maddox

Suter argues that the ALJ failed to consider the opinion of Dr. Maddox, the state agency consultant who prepared a psychological review technique form. Although the ALJ did not expressly mention Dr. Maddox in the opinion, the ALJ did state that he had considered the opinions of state agency medical and psychological consultants pursuant to Social Security Ruling 96-6p. Tr. 450. The SSR provides that findings made by state agency consultants must be treated as expert opinion evidence of non-examining sources and may not be ignored, and refers to the factors for evaluation of such evidence under §§ 404.1527 and 416.927, discussed above. 1996 WL 374.180, at *1.

The ALJ's RFC formulation is consistent with Dr. Maddox's assessment, the SSR, and the regulations. Dr. Maddox opined that Suter could carry out very short and simple instructions, perform activities on a schedule, sustain an ordinary routine without special supervision, work around others without distraction, interact adequately with peers and supervisors, make simple work-related decisions, and could adapt to most common challenges in the workplace. She had moderate limitations in understanding, remembering, and carrying out detailed instructions and maintaining concentration for extended periods, and moderate limitations in social interactions. Consistent with Dr. Maddox's opinion, the RFC limits Suter to unskilled work involving only simple, repetitive tasks without fast-paced activities or high production quotas, and only occasional interaction with the public and coworkers. Dr. Maddox cited the medical records. Any failure on the part of the ALJ to expressly mention Dr. Maddox's opinion is at most a non-prejudicial defect in opinion-writing technique that does not merit reversal. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion-writing technique is not grounds for reversal when that deficiency had no bearing on the outcome).

4. **Nina Epperson**

Nina Epperson was a non-treating psychologist who examined Suter in 2012 and 2014. In 2012, Epperson offered the opinion that Suter has a mental illness which precludes her from engaging in employment suitable for her age, training, experience, or education for a period of 6-12 months. In 2014, Epperson opined that Suter has a mental illness which prevents her from being suitably employed and that would last at least 13 months. The ALJ did not expressly assign a weight to either opinion, but did state that the 2014 opinion was not supported by Epperson's own exam findings or the medical evidence on the whole record, and went to the ultimate issue of disability.

Suter argues that the failure to assign a weight to the opinions was "legal, reversible error." Doc. 12, p. 20. But the 2012 opinion states that the alleged disability would exist for no more than 6-12 months, which is not a sufficient length of time to qualify for disability. §§ 404.1527(a)(1) and 416.927(a)(1). While the ALJ did not expressly identify the weight given the 2014 opinion, the ALJ did expressly identify reasons, provided under the regulations, for discounting the opinion and the ALJ clearly did not it any significant weight. Even assuming it was error not to assign specific weights to Epperson's opinions, it was non-prejudicial error and does not justify reversal. *Robinson,* 956 F.2d at 841.

Furthermore, the ALJ's conclusions that Epperson's opinions were not supported by her own exam findings or by the medical evidence as a whole, and that they went to the ultimate issue of disability which is an issue reserved for the Commissioner, are supported by substantial evidence on the whole record. For example, although Epperson opined that Suter was entirely disabled due to mental limitations, Epperson noted in 2014 that Suter had good hygiene and grooming and her nails were nicely painted; had appropriate affect; had intact judgment and

insight; was fully oriented; had organized and goal-directed flow of thought; and showed no problems with immediate memory.

Further, while Epperson noted problems with short and even long-term memory in April 2014, such findings were not entirely consistent with her findings in 2012, and they were inconsistent with the findings of Dr. Purohit, the psychiatrist who examined Suter in July 2014 and who found that Suter's sketchy memory appeared to be deliberate. Suter's counseling records from June 2014 through June 2015 also reflect that she experienced improvement in her mental health symptoms and was even able to pursue a romantic relationship, ultimately getting married in May 2015. In short, Epperson's conclusions were contradicted by her own observations and with the evidence on the whole record.

Finally, Epperson in fact concluded that Suter could not work due to her mental health condition. The regulations expressly provide that such a conclusion is not treated as a medical opinion because it is on an ultimate issue reserved to the Commissioner. §§ 404.1527(d) and 416.927(d). Substantial evidence on the whole record supports the ALJ's treatment of Epperson's opinions. *See Mabry v. Colvin,* 815 F.3d 386, 391 (8th Cir. 2016) ("The interpretation of a physician's findings is a factual matter left to the ALJ's authority.").

### B. Obesity

The ALJ identified obesity as a severe impairment at Step 2. The ALJ also stated that he had reviewed the entire record. Tr. 404-41. He noted Suter's height and weight, that she had been diagnosed as morbidly obese, and that she had lost over 50 pounds since January 2015. Tr. 447. The ALJ stated that obesity was considered in the exertional, postural, and environmental limitations of the RFC assessment. *Id.* Suter argues that reversal is required because the ALJ failed to explain in detail how he factored in the effect of obesity on her RFC.

In *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015), the ALJ explicitly stated that he had "considered the combined effects of the claimant's obesity with the claimant's other impairments when determining that he retains the ability to perform a range of sedentary work within the limitations identified." *Id.* The claimant argued on appeal that the ALJ failed to take her obesity into account in determining her RFC. But the Eighth Circuit held that when "the ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." *Id.* (internal quotation and citations omitted). Because the ALJ had considered the record as a whole, the Eighth Circuit held that reversal was not warranted. *Id.*

This case is similar to *Wright.* Here, the ALJ's decision expressly stated that the ALJ had reviewed the whole record, expressly referred to Suter's obesity and classified it as a severe impairment, and expressly stated that he had considered obesity's effects on exertional, postural, and environmental limitations in formulating the RFC. The limitations the ALJ described in presenting the hypothetical to the vocational expert resulted in the identification of sedentary jobs, that are not performed at a fast pace and do not require high-volume production, and that avoid exposure to high concentrations of fumes, dust, gases or similar pulmonary irritants. The jobs also account for exertional and postural limitations, including no climbing, no kneeling or crawling, and no heights. The RFC is consistent with Suter's impairment of obesity, based on the whole record. Suter's argument therefore fails for the same reason the argument failed in *Wright.*

In addition, Suter does not identify any limitation due to obesity that the RFC fails to account for. It was Suter's burden to establish RFC.

### C.    The credibility determination

Suter also argues that the RFC is unsupported by the ALJ's determination that she was not entirely credible.  She says that the ALJ's findings—that she had a poor work history, she "only" had "two" surgeries, that there were multiple negative or mild findings on tests, and she had not had mental health treatment for a period of time—are not good reasons, supported on the whole record, for concluding that she lacked credibility.  Doc. 12, pp. 23-25.

The ALJ's conclusions are supported by substantial evidence on the whole record.  Suter had had no substantial gainful employment for several years prior to her alleged onset date.  Tr. 693-94.  A poor work history is a factor that may considered in evaluating credibility, as it suggests lack of motivation to work and calls a disability claim into question.  *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

The ALJ did not minimize or overlook Suter's history of four knee surgeries.  The ALJ noted that Suter had had "multiple" knee surgeries, the most recent one having been performed two months before the second hearing.  Tr. 445.  Suter testified that it was too soon to assess the results of that recent surgery.  Tr. 474.  But the ALJ accounted for her right knee impairment by including exertional and postural limitations in the RFC.  Suter does not identify any additional limitations due to her surgeries that the RFC fails to account for.

Next, the record in fact contains numerous negative test results and documentation of mild objective findings on exam over a period of years that fail to support Suter's claims of debilitating physical impairments.  The record also contains numerous opinions from specialists who were unable to identify an objective cause for her alleged impairments, and reflects that various physicians recommended psychiatric treatment.  The absence of objective findings, in the context of the record as a whole, supports a conclusion that her symptoms are not as limiting as

24

she has alleged. *Kisling v. Chater,* 105 F.3d 1255, 1257 (8th Cir. 1997).

Suter did frequently identify numerous tender points consistent with fibromyalgia on examination. However, Dr. Hancock, the pain specialist, noted that Suter's intake questionnaire was consistent with individuals who tend to magnify their symptoms and are prone to somatoform disorders. He also noted that she seemed to obtain some sense of pleasure in stumping as many physicians as she had. Dr. Kohake, a neurologist, noted that Suter gave poor effort on exam. Dr. Velazquez, a rheumatologist, noted that Suter's effort was inconsistent on physical exam when testing her strength. Exaggerating one's symptoms and giving less than full effort on exam are factors that detract from a claimant's credibility. *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir. 2006).

The ALJ also considered Suter's allegations regarding her mental health impairments. As the ALJ noted, Suter went for long periods of time without mental health treatment. In July 2012, Dr. Gerstner, a primary care physician, recommended a psychiatric consult. At a separate visit the same month, Dr. Kohake, the neurologist, recommended counseling. Suter did not follow up. Nor did she have any psychiatric admissions during the relevant period, even though at a March 2013 visit with Dr. Spurlock, she reported having felt suicidal a few weeks earlier. A failure to seek treatment weighs against a claimant's credibility. *Milam v. Colvin,* 794 F.3d 978, 985 (8th Cir. 2015).

Suter also seemed to exaggerate her psychological symptoms to Dr. Purohit, the psychiatrist who evaluated her in July 2014. The doctor noted that Suter's remote memory appeared sketchy, but also appeared to be deliberate. *Baker,* 457 F.3d at 892 (exaggerating one's symptoms detracts from credibility).

Furthermore, Suter's symptoms improved with counseling, by her own report, and at

least some of her symptoms of anxiety and depression were attributed to situational factors. Situational anxiety and depression are not considered disabling. *Gates v. Astrue,* 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1039-40 (8th Cir. 2001).

Suter's testimony regarding her alleged physical and mental impairments was also extreme. On a 10-level pain scale, she reported experiencing daily pain at level 8-10 on average due to her alleged impairments, in contrast to the pain at level 4 that she experienced when giving birth. The medical records do not document complaints of daily, maximum pain or near-maximum pain, nor do the records reflect that Suter has ever gone to the emergency room for treatment of such pain. She reported that her insomnia is untreatable, but Dr. Katz prescribed medication for it and at subsequent visits, Suter told him it was helping. She stated that she is not physically or emotionally strong enough to ever do fun things, but she was able to form a relationship and then get married in May 2015. She said that she forgets how to say words, spell, or speak, and can't even hold a book due to hand pain. But she was able to prepare a lengthy, typed adult function report in June 2014, including a detailed narrative of her alleged symptoms. *See* Tr. 746-764. She testified that her pain medications caused her to sleep 12 to 16 hours a day, but no such complaints are documented in her medical records. She stated that she does not hold forks or knives, and her food is "flung around a lot" at mealtimes, due to hand tremors, but her medical records reflect no more than fine resting tremor. A claimant's subjective complaints may be discounted if the evidence as whole is inconsistent with the claimant's subjective testimony. *Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).

Substantial evidence on the whole record supports the ALJ's conclusions regarding Suter's credibility.

**D.     Findings at Step 5**

Finally, Suter argues reversal is necessary because the Commissioner did not sustain her burden at Step 5.  Suter argues that the vocational expert's testimony about one of the three jobs identified, document preparer, was inconsistent with the Dictionary of Occupational Titles.  Specifically, she argues that her RFC is limited to repetitive work, but the document preparer job as described in the DOT is not repetitive.  Suter also argues that the vocational expert otherwise failed to establish that the three jobs she identified exist in significant numbers in the national economy, and the ALJ failed to make a finding about the number of jobs.  Suter's arguments do not merit reversal.

The vocational expert, Stella Doring, testified that a hypothetical individual with Suter's RFC, including a limitation of repetitive work, could perform the jobs of document preparer, addressing clerk, and cutter/paster.  The ALJ asked Doring at the beginning of her examination to identify anything about her testimony that departed or deviated from the Dictionary of Occupational Titles, or its companion volume, The Selective Characteristics of Occupations, which she agreed to do.  Tr. 487.  Doring did not point out any differences during her testimony. *See* Tr. 487-494.  Doring did testify that there were 175,000 document preparer jobs in the national economy, 44,000 addressing clerk jobs, and 30,000 cutter/paster jobs.  Tr. 490-91.

Assuming that the document preparer job is inconsistent with the DOT, as Suter argues, the VE identified two other jobs.  Suter suggests, however, that the VE's inclusion of the document preparer job shows the VE's testimony was unreliable which the ALJ did not realize, and that the error therefore cannot be considered harmless.  But the Eighth Circuit has expressly held that a VE's "mistaken recommendation" can be harmless error where the VE has recommended other work that a claimant can perform with her RFC.  *See Grable v. Colvin*, 770

F.3d 1196, 1202 (8th Cir. 2014). Furthermore, nothing suggests that Doring failed to identify another repetitive job, consistent with the DOT. For example, the cutter/paster job (DOT 249.587.014) involves tearing or cutting marked items out of newspapers and magazines; recording the name of the publication, page and location, date, and name of customer on the label; and affixing a label to the clipping. In other words, it is repetitive. Moreover, nothing in the record suggests that the ALJ would have decided differently had the ALJ realized the addressing clerk job was not repetitive. *See Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred.")

Finally, the VE expressly identified the number of jobs available in the national economy, with respect to each of the three jobs identified, and the ALJ expressly cited that evidence in the decision. Tr. 452. To the extent the ALJ failed to make an express "finding" about the job numbers, it is at most a non-prejudicial error in opinion writing.

Suter's argument concerning the Step 5 findings therefore fails.

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 25, 2017
Jefferson City, Missouri